Before you start, maybe you could give us a little preview of the structure of this so that we can see if that's going to make some sense in terms of our trying to address all of the issues with the different defendants. Sure, Your Honor. Kendra Matthews with Ransom Blackmon on behalf of Mr. Anderson. I believe you have the case of Dr. Kirkham submitted on briefs, so there are three other co-defendants here. The co-defendants have agreed to rely on our briefs for independently raised assignments of error. Our intention was to discuss with the court the re-instruction of the jury after deliberations began for approximately 10 minutes or so, and I would be handling that discussion with the court. We would reserve the balance of the time for rebuttal argument with the caveat that if sentencing issues on cross appeal are discussed with the court, that the co-defendants with cross appeal sentencing issues may want to use some of that rebuttal time to address those issues. If not, then Well, they should assume that, at least from my standpoint, I'd like to hear a little bit about the sentencing issue. And that is why we tried to divide it fairly equally, but because it was a cross appeal issue, permit the government to argue first on sentencing. Well, I'll just say, I don't care if you address it now, or, Honorable, I'm interested in the conspiracy set up, multiple versus single, and so if you don't address it, I'll ask the government, and so you need to have somebody prepared to address that, all right? I think I'll anticipate addressing it on rebuttal argument, Your Honor. All right. Let me give a little thought to it. The central argument that we believe the court should be reversing all convictions on in this case for defendants is that after a 25-day trial in which numerous issues were raised and 90 number of witnesses were called, the defendants were precluded from giving an effective closing argument and were effectively denied assistance of counsel in closing argument due to the re-instruction of the jury after about 12 hours of deliberation. The basis for those claims comes from both Federal Rule of Criminal Procedure 30 and the Fifth and Sixth Amendment at the outset. The standards are very similar. The question for the court when there is a re-instruction after the defense counsel has been advised what the instructions will be is whether or not the court can say that the court cannot conclude that closing was not impaired, and that involves a lot of negatives there, but I think that's the way the standard is phrased. If the court cannot conclude that closing was not impaired, then it should reverse the convictions, and that is certainly the second issue that the trial court acknowledged was a major issue in the case. Many defendants moved to dismiss the case based on statute of limitations grounds which on the indictment which were denied. It was an issue that they were concerned about. Certainly with some of the latter counts, Counts 6 and 7 for Mr. Anderson, the actual acts of evasion alleged were outside the statute of limitations. And in closing, the defendants had asked for statute of limitations instruction on all counts and were not given that instruction, and therefore they structured their closing argument accordingly. A closing would make no sense making all sorts of references to dates when the jury would not be told that those dates would have any meaning. In the case law that you look at, particularly Can you just, being familiar with the case law, could you help us by giving us some specific example of what you were foreclosed from arguing because of the late introduction of the statute of limitations issue and the issue of overt acts? Sure, Your Honor. I think as a preliminary of that, and then I will get to an example, I think our fundamental argument would be that the defendants certainly would have retailored or restructured their closing arguments to at least address the concept of statute of in the indictment. The jury question itself at least provides an inference that the jury was seeking to look outside the indictment for overt acts. Let me just get a factual question then. At least with respect to going beyond the 41 specified acts, was it not the case that the arguments covered some of the acts that went beyond the 41 that was included in the argument, was it not? Well, I think that will probably get to your first question as well, answering that. To what end were those issues addressed? The example, in fact, that the government used in hearing with the judge, I'm not sure if it was a telephone conference or in person, once the jury asked the question was, they said, Your Honor, the language of the indictment we now see permits us to have these acts. We would refer you to the Mitchums or the Mitchells. I always get their names incorrect. Their testimony was in volume 12 of the transcript. And they said, Dr. Kirkham referred to the Mitchells in his closing argument. That would be an overt act that the jury could consider. In fact, Mr. Mitchell raised it in closing argument to say that's not a part of this case. In fact, there had been a limiting instruction to the jury, saying, You're going to hear testimony on occasion that relates to only one defendant. These may be bad acts. We instruct you that if it relates to only one defendant, it goes to his state of mind. Keep that in mind with these two defendants. The judge did say, If you think evidence relating to CPA specifically can establish Dr. Kirkham's entry into the conspiracy, you could consider that. One of those acts, a number of those acts, but the only one really relating to CPA, took place in October 1994. That certainly wasn't addressed in anyone's closing argument. So there you have the Mitchells testimony that in the midst of trial, people understood to be relating to Dr. Kirkham and his bad acts. And now, after the jury's been deliberating for 12 hours, you even have the prosecution, the government, saying, Hey, you know, just off the top of my head, one overt act that they could use to convict all defendants would be the testimony relating to Dr. Kirkham and the Mitchells. So understandably, over 25 days, people and the jury, we assume, rely on the instructions of the court. We have to be realistic in that. And that is why I think it goes back to not, Can you show prejudice as to what specific things you would have argued? But was counsel given the opportunity to make a tactical decision about how to marshal the evidence? Well, that's why I'm pursuing it. Because if the standard, as you say, is cannot conclude that the closing was not impaired, that's not an abstraction. Because always, your closing would be restructured if you had a different instruction. I mean, almost by definition. So it really includes some notion of prejudice. And to understand that, it's helpful, at least from my standpoint, to try to understand pragmatically what difference it would have made. Because in some sense, to the extent that the statute of limitations hadn't been included, the jury certainly got that message in the re-instruction that you could only look to those that occurred post the 95 days. Sure. And my point, I guess, with the Mitchells would be that they would have to be relied on their own memory to remember which acts that were not fled in the United States occurred inside or outside. Was that outside the statute of limitations? Dr. Kirkham, in the Mitchells testimony, I believe the conduct was both in and outside. But the limiting instruction said that most of those bad acts were only to Dr. Kirkham. Even if you allow that, the act of introducing the Mitchells to CPA, the warehouse bank, was October 94, outside the statute of limitations. So that's my point in terms of making a tactical decision and one that perhaps, yes, maybe Dorothy Flowers' attorney would have focused mostly on her conduct and restructured his closing argument to say, look at these acts that they claim are closest tying her to the conspiracy. Look at how long ago they were. And perhaps he wouldn't have addressed Dr. Kirkham, but there certainly was a tremendous amount of coordination you can see throughout the case that they may have made a tactical decision to rely on someone else to make that argument so that the whole closing was effective in that regard. Getting back to the standard or the idea of prejudice, I do think, Your Honor, if you look at the case law, you have United States v. Parville, 501 F2D 296, and that is cited in the briefs. In that case, there was a re-instruction. And the court said, wow, there's almost overwhelming evidence of guilt here. And the reference that the judge threw the defense attorney off on in closing was really quite brief in closing. And they said, in that context, even though it was nearly overwhelming and it was only a portion of the closing argument that was affected, we cannot say he wouldn't have re-tailored it to be effective. And that would be our argument on that end of the spectrum, that we're much closer to that. And certainly with issues like statute of limitations, you would have to change your approach. On the other end of the spectrum, you have, let me get the case name, Wyckoff, which is 545 F2T 679. That is really the only case in which this precise issue is raised and the court of appeals does not reverse. And in that instance, the judge actually added an element to the state's burden that the defendant had not produced any evidence on. So the court said, I'm not going to instruct that you have to show that you were incited to assault, I think. It was something related to that. I'm sure that's not precise. He had presented no evidence. The facts were that he had been sitting there and then suddenly in an assault. And the Ninth Circuit said, there was nothing, no evidence that the defense attorney could have come up with. And therefore, we can find no prejudice and we won't reverse. Here, I think that's not at all our situation. There was so much to work with that we didn't consider. What was the first case you mentioned before? The first case was Harville, 501 Harville. And that incited both of these cases. Yeah, I know. I just wanted, I wasn't sure I was catching the name of the case. And then on the overt acts, and we've obviously focused tonight, and I think the court's attention can focus on the closing argument aspect of the overt acts. But I did note that there was a case that was quite procedurally different, but United States v. Scherr, 794 F2D 903. And in that case, the judge had given an instruction identical to the instruction here, which was that the jury was told they had to find at least one of the overt acts listed in the indictment. And the court there said, had appellants known that they might have been convicted on the basis of acts not listed in the indictment, they might have sought to controvert those acts. The trial judge's instruction appeared to preclude that possibility, however, and therefore, they did not argue that issue as they might have otherwise done. It is axiomatic that a person may not be convicted on the basis of acts that the parties have been told cannot support a conviction. Other than that quote, it was quite procedurally different, but I think that's exactly what happened here. They were first argued, we were told, you can only convict on the basis of the acts listed in the indictment. We argued the case. We did not address those other acts as overt acts in furtherance of the conspiracy. Then the judge re-instructed, and in fact, although it was axiomatic in the Third Circuit that that couldn't be done, there's a possibility that a person was convicted on the basis of acts that the parties have been told could not support the conviction. And for that reason, we think that the conviction should be reversed. I'll reserve any other comments. May it please the Court. My name is Karen Quinnell, appearing on behalf of the United States. As to the statute of limitations issue, this case is not like Fuchs, where the court did not give the jury a statute of limitations instruction at all. Here, the district court gave the jury a statute of limitations instruction, albeit in the middle of jury deliberations. And therefore, the jury could reasonably have been expected to follow the court's instruction. Indeed, we must assume that the jury follows the instruction. But that doesn't solve the defendant's problem of, of course, the jury has to follow the instructions are, how do you make your argument to the jury on such a critical question? Well, in this case, the question of whether or not an overt act took place on or before November 15th of 1994 is not a question that is complicated or confusing for the jury to decide. The jury does not need to have guidance by counsel say, don't forget, this act happened October 7, 1994, which is before November 15th, 1994. In the middle of jury deliberations, right when they were considering what overt act were they going to agree on, they were told by the court, you must find an overt act either listed in the indictment or substantially similar to those listed in the indictment that occurred after November 15th, 1994. But if that's the case, just let me pursue this with you then. If, if the jury sends out a note and they've been told by the judge in the instruction that you can pick any out of a range of these overt acts, but you must unanimously agree on at least one, and the jury sends a note out and says, gee, can we go back? Can we go outside the 41 overt acts? Doesn't that suggest that they may have been hung up on reaching agreement on the ones that were presented to them as part of the universe, be it overt acts and statute of limitations, and then said, let me finish my question. So that therefore, had the instruction been correct at the outset, and I know I'm blending overt acts and statute of limitations together, but that they would, it would indicate that they were hung up and therefore it was relevant to them to hear argument on why, if they couldn't agree on anything out of the 41 that was before them, have focused argument before they went into deliberate so that it would help them understand whether they should or shouldn't agree on the ones that they ultimately did. Now we, of course, don't know whether they were looking to find multiple overt acts or they were zeroed in on one. I don't know what, obviously we don't know that, but how does one tie that into the standard of how one structures one's closing argument? The language of the indictment and the evidence at trial clearly put the defense on notice that the government was going to put on evidence and that the defendants would have to defend against evidence of overt acts other than the 41 listed in the indictment. For example, the indictment alleged that the co-conspirators committed overt acts, including but not limited to the following, and then listed some 41 types of acts or individual acts. For example, one category of acts is every time a deposit was made to CPA or every time CPA wrote a utility bill. The jury instructions, the original jury instructions to the jury informed them that they had to agree on an overt act as alleged in the indictment. As alleged in the indictment, the overt acts included but not the following, but not limited to the following 41 acts. So the defendants knew from the language of the indictment and the evidence at trial, they would be facing more than simply the 41 overt acts listed in the indictment. The jury, which correctly stated the law, that you can consider overt acts not specifically listed in the indictment, merely clarified the court's original instruction that directed the jury to the specific language in the indictment that noted that the 41 listed acts were not excluded. Well, the jury picked up on the included but not limited to. That was the body of the note. That's correct. And they wanted clarification. They wanted to make sure. Can we agree on what it says? Because it's not limited to. And the court properly informed the jury, yes. And in Frank's, the court recognized that there is, of course, flexibility in proof because we can never expect a trial to be an exact replica of the information put before the grand jury or the language used in an indictment. And so long as the defendants are on notice of the core of criminality, the nature of the offense against which they must defend, it's okay for the jury to consider overt acts not specifically listed in the indictment. And here, there's no doubt that the defendants were on notice of the nature of the offense against which they had to defend. It was a decade-long conspiracy to obstruct the court. Did the government, in closing, did you try the case, were you? I did not. Okay. Did the government argue overt acts beyond the 41 to the jury? Specifically, I know that the government mentioned overt acts relating to a person, Lonnie Crockett, who came to the warehouse bank and used the warehouse bank for numbers of people. He was selling, he had his own scheme, he was selling trusts to people. And his clients would use CPA, two accounts in CPA to send, one account would send money to an offshore entity. The other account at CPA would receive a wire transport from the offshore entity, and that would be treated as a gift, so changing the character of their income. And the government addressed that particular area, which was not specifically alleged in the indictment, during closing argument. And defense counsel, specifically I believe defense counsel for Richard Flowers, addressed the Lonnie Crockett scheme. I have one other question. I know Judge McKeon wants to ask about the conspiracy, but I would like to just, on the statute of limitations, a similar question. Did the government, in its argument, rely on overt acts that predated the November 1994? Well, I do know, what I do recall from the closing argument is that the government and the defense both said, there's 41 overt acts listed in the indictment, you need to pick one of those. So, by reference, obviously they did. And those were all post-dating November? No. Some did and some did not. So the answer is they did go back before the statute of limitations? That's correct. They straddled the statute of limitations. And the way, although naturally we understand that this is certainly an unusual way to charge the jury on the statute of limitations. And we think that the court had every intention of giving the jury a statute of limitations instruction. For whatever reason, he didn't. He did give it to them during deliberations. The jury obviously, after reading that, focused their attention on the dates of the overt acts that they were looking at. So I think that it's clear beyond a reasonable doubt that the defendants could not have been convicted by this jury under the instructions the jury had on some overt act that took place before November 15th, 1994. Do they have the dates in front of them? The jury? You mean the date for the statute of limitations? Yes, and the dates of the overt act. Yes, they did. The court gave both oral and written supplemental instructions. And right in there, several times, it said the overt act or affirmative act of evasion must have occurred. But I'm wondering if they knew or had before them when the overt acts occurred. Well, as to the 41 listed overt acts, they certainly had those dates. The jury in this case was taking notes. So perhaps they were taking notes on the dates. Obviously, the jury's recollection of when an event occurred would control. And in addition to that, there are perhaps hundreds, perhaps thousands of overt acts that took place. Wouldn't that substantiate the argument that the defense has that here there are 41 acts and then there are others that were argued and the jury would not know, unless they took really good notes, what date that was. But that would be the sort of thing that we pointed out in that argument. That is a thing that the defense could have pointed out. You know, don't forget, these acts took place a long time ago. They took place at a time. Well, they took. You can't consider them because they took place before the statute. Well, you can't consider them as an overt act as an overt act satisfying. That's right. So that would be kind of an important thing for the defense to be able to point out, wouldn't it? Because there's a lot to expect the jury to remember the dates of all the overt acts. Yes. But, you know, we expect the jury to remember all kinds of things. And we do know that they were taking notes and we do know that they were focused by the court's instruction on the time. We expect the defense attorneys to have an opportunity to make oral argument to point those things out. That's correct. The defense did not bring to the court's attention prior to the court. The defendants could have objected after the court instructed the jury and said, we want to reopen closing argument and make an argument about the timing of events. They never brought this to the court's attention. So the issue before this court is, was it plain error to give the statute of limitations instruction deliberations when the timing of an event is always a plain mirror not to allow them to argue? I think the court refused to allow them to argue it. There was nothing the matter with giving the instruction that that was correct. Right. So the question is whether it was plain error for the judge not to allow them. The district court did not refuse to allow them to raise the statute of limitations. They did not attempt during their closing argument to raise that. The reason they claim that they were precluded from that is that the court's proposed instructions did not include a statute of limitations instruction, but they didn't stand up before the court read them and say, Your Honor, statute of limitations is vital to our case. We can't argue statute of limitations if you won't give a statute of limitations instruction. No, I'm talking about after he had made the additional instruction. That's the time that I believe the defense is contending that they should have had an opportunity to argue. Well, I suppose they could have asked to reopen closing argument then. But they didn't do so. So they waive the any objection on that. I don't believe that they were playing there for the court not to have to respond. They ordered. It seems to me that it's not. It is a pretty straightforward question. When did something happen? And there was so much evidence that this conspiracy was ongoing until virtually the time of the indictment that it defies belief to think that the jury picked an overt act that occurred in 1987, as opposed to one that occurred after 1994. Let me ask you about the conspiracy of the single versus multiple conspiracy. Excuse me. Could I just ask one question? Did they have the indictment before them? The jury? Yes, they did. Well, because the indictment lists the overt acts in the indictment. Yes, they're listed. I mean, and they're dates. There are dates. They're all dated. There are other overt acts. Yes, that came in. So that gets into the other issue. Exactly. Okay, fine. Sorry. No, that's fine. We want to make sure we've exhausted. You can always come back if you think of something. I'm here. Why, thank you. The multiple conspiracy issue versus single. Yes. The one thing that I'm curious about with respect to the government's theory, is it that the mere membership in the CPA was, in fact, illegal and part of this conspiracy? Is your question was mere membership of CPA? Right. Was that the criminal act? No. Okay. No. The jury was instructed, well, first of all, the indictment charged that the co-conspirators, those listed and certain unnamed conspirators, participated in using CPA to defraud the United States by preventing the government from being able to determine who had income and what income was assigned to which member, which client of CPA. The jury instructions instructed the jury that they needed to find, among several other things, that the defendants willfully agreed to engage in the conspiracy that was alleged in the indictment, that being a broad conspiracy to use commingling of funds, false names, false social security numbers, phony trusts, writing checks. And you need that agreement for each defendant, correct? That's correct. And on more than one occasion, the court said, you must find that the defendants agreed to participate in the plan alleged in the indictment. Okay. So one of my questions is why isn't each of the defendants, in effect, signed up to that agreement? How are they joined? Well, they're joined. Are you speaking of a rim sort of thing? Well, yeah, if there is that. We want to use that as the joinder. I wouldn't say that so derisively. That comes from the United States Supreme Court. So I didn't dream it up. No, no, of course not. Many courts have said, you know, we just looked to see whether there was one overall agreement. And that's what you look at. What was the overall agreement? That is how they are joined. They're joined by the overall agreement to join together, to use their numbers to defraud the United States, to prevent the United States from finding out who has money. Does that mean that all the other people in this CPA are unindicted co-conspirators? Well, naturally not all of them because, of course, as to prove anyone is involved in a conspiracy, we need to prove appropriate intent. And as to all of the defendants that were charged, we proved the appropriate intent. For example, Mr. Kirkham, he was recruiting people, all kinds of people, to come in and use CPA. Look, it's totally safe. Your money will be safe there. You can hide the fact that you're making money from your business. Mr. Anderson was using the services of CPA for almost a decade. He would change the name of his business so that it would be commercial printing and art so that all checks he received could be payable to CPA so that when they were commingled with the other account holders, it would be even harder for the government, if they ever figured out what was going on, to trace. Because if you have 10, 20, 30, 100 people running businesses, all having their checks paid to CPA, how can we figure out that that check to CPA is a payment to John Anderson? Well, I guess that, to be more precise then, you're not saying that warehouse banking in and of itself is illegal, but that these particular individuals in their use of warehouse banking showed the requisite intent of the agreement. That is absolutely correct. So the mere fact that they advertised it as a program by which the funds would, in effect, be commingled and that it would assure privacy and hide the paper trails so the IRS couldn't track it down, you're saying that that alone was not sufficient? Well, that certainly gives us... So that anybody who joined CPA would, in essence, be by that act alone guilty of a conspiracy? By merely joining CPA? Yeah. I don't believe they would. I mean, that certainly gives an explanation of what their whole thing is about. But I believe you're referring to Government Exhibit 45. And if you take a look at that, it does refer to other kinds of things. So I believe that it's possible, I don't know if it really happened, but it's possible that someone could have used CPA because they wanted to buy gold. Well, some significant number of people paid their taxes. And some people did pay their taxes. Yeah, not an insignificant number. You know, we're not saying that those people conspired to defraud government. If the defendants or a hypothetical defendant joined in CPA, knowing about what they were going to do, knowing the whole thing, and at the end of the year he filled out his tax return and mailed it in, we certainly couldn't say that person was evading their taxes or preventing the government from finding out what kind of income he had. So it all depends on how you use it, if you're an individual account holder. And as for the people that were operating it, I mean, we know they were operating this specifically for at least this purpose. Maybe more purposes. Maybe they really wanted to, you know, purchase gold or whatever. But at least one of their purposes was to impair and impede the Internal Revenue Service in the carrying on of its proper functions. Okay. Could I ask you, if there aren't questions on the conspiracy, on the sentencing? The court relied on 3584. That's correct. So assuming that in order to avoid the consecutive sentences, that was appropriate, what more did the district court have to do, in your view, to justify the downward, in effect, the downward depression? Well, first of all, the district court, if you look at the district court's findings of fact, which I have back on my desk, but you can see that the district court, excuse me, specifically says, I am denying. Have some water. Water. Take your time. We're here all day. But it's your clock that's running. Just like me. The court specifically says, I am denying. I'm very sorry. I have a cold. That's all right. I'm denying Richard Flower's motion for a downward departure. The court said, in the middle of sentencing, I'm informing. Oh, I'm sorry. Take your time. Take your time and drink. Start over. It may be gone. Why don't you yield to the other side and recover your voice? Thank you. I'll come back on sentencing on that issue. Why don't you address anything you want to address on the conspiracy or on the re-instruction?  Briefly on the multiple conspiracy issue, at least from Mr. Anderson's part, we're content to rely on the briefs, although we do think our brief outlines that, in Mr. Anderson's case in particular, he was acting at most on his own in a conspiracy for himself. As outlined in our argument, that would be our argument on multiple conspiracies. Turning to some of the statements that were made regarding the statute of limitations issue, I guess the first issue would be preservation. The trial court itself found that the statute of limitations request was preserved. The court noted, and I think this is outlined extensively in our reply brief and as well as a number of other reply briefs, that it wasn't inadvertence that the court did not give a statute of limitations instruction. He was aware defendants wanted it. He was relying on the government to provide him with all the instructions that were appropriate. Defendants also sought a special verdict form, in which case the Overt Act would have been identified and may have resolved these issues. That was not used. The court made it very clear at the hearings that he was giving a conscientious review to everything submitted, and he wanted the most precise make your record sort of thing, which I know district courts sometimes do not completely understanding the preservation issue. But he did subsequently say this issue was preserved. There's no question. I'm trying to understand. So you go into the argument thinking it's an unlimited universe of overt acts and time and argue, therefore, all that you think are important. As Judge Huggs' question suggested then, had there been a November 94 cutoff date, what would have been better for your argument then? As it is, you've got a chance to address them all. So what is it that the cutoff date would have done other than say, and by the way, these overt acts or these acts that are being talked about by the government are pre-November 94, so you can't rely on them. I'm not sure if I understand the scope of your question. When the defendants requested a statute of limitations instruction and, in fact, reviewed an instruction that said you are limited to the acts outlined in the indictment, which I will get back to, that is how the defendants framed their argument. They then did the closing, as we discussed previously. They didn't even structure it to discuss time frame. There would have been no purpose. The jury would have had nothing to the jury. So it's our contention that the argument was not framed properly. But what would be the difference in the argument, other than to say they can't rely on those overt acts because they're pre-94? Certainly for the acts that were pled in the indictment, they could have pointed out the different acts that were pre and post. But also they could have pointed out whether the overt acts that were in the indictment that were appropriately timed were in furtherance of the indictment, and maybe there was a stronger argument that those were not in furtherance of the indictment, and maybe the arguments would have been able to quickly disregard the ones outside the statute of limitations and focus their arguments on the ones that were inside. Here you go beyond that because you're not just looking at the indictment. You're looking at the whole scope of the trial. Much of that evidence was introduced for different purposes, and the government is entitled to introduce evidence of agreement. And, in fact, during the closing argument, the only references that were made to these other acts were relating to agreement, not to whether or not it was an overt act in furtherance of the government. What happens then at trial, jury goes back, note comes out, new instruction is given. At that point, the defense doesn't ask for additional or supplemental argument. Is that correct? That's correct, Your Honor. And at that point, the jury had been deliberating for 12 hours or so. They had perhaps an overt act specifically in their mind, perhaps not. It was too late for defendants to certainly on the fly structure an argument that would say, okay, now we know you're going to consider the whole world of overt acts, and we don't know what you're thinking, but we'd like to say, don't think about this issue from day two of the trial. Don't think about these issues. It would have been nearly impossible to do that. The judge gave the parties a half an hour to come back with their agreement and then overnight to instruct the jury. And he said, you know, they're deliberating. I've stopped them from deliberating. I want to continue with this process. But you had overnight? That's true. I guess I'm just, you know, we're in a situation where you're saying the argument would have been different, and maybe what you're really saying is that there's no way to recoup it. You don't think that supplemental argument would have been effective, but it would have been a partial remedy to your concern. Well, I don't think it would have been a partial remedy to our concern, although obviously given the opportunity we would have done it, we still would be before this court if there had been a conviction, arguing that that is no way for the Sixth Amendment to operate in terms of counsel making argument. Let me ask you about the timing. I want to finish that, though. On the timing of this, you asked for a statute of limitations instruction. Did the judge affirmatively tell you he's not going to give it, or did it just not show up when he gives you the court's proposed instructions? Well, the way the trial operated, statute of limitations was raised as a motion at the beginning. Right. It was argued throughout, and then it was submitted as instructions under Rule 30, submitted instructions. Then the judge said, you know, I've reviewed everyone's instructions. Please let me know anything you specifically want me to look at. And we did draw the court's attention. We did draw the court's attention specifically to the statute of limitations instruction and said to the court, you know, please take a look at instruction number 29. We want you to look at it. Then the judge took the instructions provided by both parties, came back, and I think I outlined in the reply brief, essentially adopted the government's instructions and said, you know, here's what I'm going to do. Here's what I've decided to do. At the time, was there an objection to not giving? I believe at the time, at that point, it would be in the briefs, Your Honor, and I just don't want to misstate the record. All right. It would be in the reviewability section of exactly the procedure. I'm not sure that he did. It's crucial to note, of course, that when it was done, the judge made it clear that he was conscious, and that's really the purpose of preservation, to give the trial court the opportunity to make the right decision. The judge made it clear in an order that is in our supplemental excerpt of records. Dependents preserve this issue. So whether you would want to go under Kessy and the would it be futile to make a further objection if there wasn't one at the appropriate time immediately before argument, or if you simply want to say it was preserved, either way, it's not a plain error standard, because the judge made it clear that he was aware and that he had decided not to give it. Could I pursue, you answered in response, talking about the statute of limitations, how it would affect the argument. You said, well, some of these acts were put in for other purposes. Does that relate to the statute of limitations issue or to going beyond the 41? It's a difficult time idea for me conceptually, Your Honor, to keep them both out. I would say if you stay within the indictment, then our argument would be, you know, those statute of limitations issues are all outlined and the evidence admitted to them was direct. So you only get to the statute of limitations concern. Really a broad concern. Once you go outside the. So they're really intertwined. They're really tight because the indictment does specify when they actually had that in front of them. We didn't have to have any of you to our notes because the indictment lays out the chronology. So certainly we can't look at this. Certainly our argument. Although we would argue we'd like to structure. But you're right. All right. That's just what I wanted to clarify. Your Honor, I'm way beyond time. That's fine. Questions regarding a particular defendant sentence. No, although we're going to let the government make an argument on sentencing and then we're going to give you all appropriate opportunity to respond. I think this was in response to your question. We're talking about Mr. Flowers. Judge Fisher, would you like me to address the question you were trying to ask me? Yes. My question was what a it was a proper. Do you agree that the proper for the district court to resort to thirty five eighty four? And if so, what did he fail to do in order to justify? OK. First of all, it was improper for him to resort to thirty five eighty four. He specifically said in his finding the fact order on page five, the court acknowledged that it had discretion to consider the defendant's Richard Flowers motion for departure, but declined to do so in his case as to thirty five eighty four. He says, I always retain discretion to impose concurrent or consecutive sentences whenever I determine what the appropriate total punishment should be. Accordingly, during the sentencing hearing, the government at the court for the first time informed the government, I'm going to impose concurrent rather than consecutive sentences on Richard Flowers. The government had no idea that the court was contemplating a downward departure. The government objected on the basis of 5G 1.2, which requires in situations such as this, when the lower part of the guideline exceeds the total statutory maximum available on the count of the highest statutory maximum, that sentences must run consecutive to equal the total punishment. So the government objected on that ground. The district court rejected that saying, I assume I have discretion to impose the sentence concurrently. And that's what I'm going to do. If the government had known that the court was contemplating a departure, which is the only way he can impose the sentence that he imposed under Pedrioli and Williams cases in this court, the government could have marshaled evidence, gotten together evidence of sentences nationwide in cases involving a long time. I understand what, okay, all right. That's answering part of my question. But you said it was improper for him to go to 35A at all. You're saying he's foreclosed from doing that, that he doesn't have discretion to do that? Well, not in the Ninth Circuit. In the Ninth Circuit, under Pedrioli and Williams, he can impose those sentences if he downward departs. Fine. Okay. And so what he failed to do was follow the normal downward departure procedures. Didn't find the case was outside the heartland, didn't give the government notice. All right. Thank you. And he tied the other two to the flowers. Exactly. It's in your brief. That's laid out pretty clearly. Okay. Thank you. Thank you very much for your courtesies, Your Honor. Okay. We're very courteous to people from Washington, even in the Ninth Circuit. All right. Thank you. Why don't you respond on the flowers? We recognize that there are, I guess, three other defendants who potentially would flow from an answer to that. But if you could respond on that point, it would be helpful. Good morning, Your Honor. Chris Weinmiller for Richard Flowers. Your Honor, on the issue of the downward departure that the court granted, I think that it is true that none of us were recognizing at the time that that, in effect, constituted a downward departure in the circuit. I do think, though, that the procedures that Judge King followed were adequate under the law here. The two cases that the government just cited, the Pedrioli and the Williams case, were both cases in which the court decided, the district court decided to impose consecutive terms, despite the fact that the guidelines would have called for a sentence within the maximum of the primary offense. In other words, the guidelines would have suggested that concurrent terms were appropriate and the district court wanted to impose a greater sentence given upward departure. And so I think that the emphasis that this court places on the need for notice ahead of time really has to do with the defendant's due process right to know what he's facing. And I would suggest that because in this situation, the court was considering that it's giving a downward departure to Mr. Flowers, that notice issue is less important than it was in Pedrioli and Williams. I would also point the court to the sentencing memoranda and the sentencing letter, which is contained, I believe, in the pre-sentence report. It's appended to the pre-sentence report that the government just recently filed under seal. It's clear in both of those documents that, in fact, Defendant Flowers was asking the court to impose concurrent sentences. Again, it wasn't referred to in the context of a downward departure, but it was obvious that that was an issue that the government needed to respond to at sentencing. And lastly, when the government- I just understand that you're saying that assuming that in order to avoid the guideline sentence, then the court had to resort to 3584. You're saying that we should read Pedrioli and Williams as simply applying to upward departures, in effect going to consecutive over concurrent. But if it's a downward, then it really boils down to nothing more than a question of notice and the reasons that the court gave here were adequate. The court would still have to make the appropriate findings, and I think the court here did. The Doss case, which is also cited in the briefs, 198, Fed Third, 1167, it's a 1999 case from the circuit, indicates that a proper basis for a downward departure can be sentencing disparity. And the district court in this case specifically cited sentencing disparity in similar cases. I think he used the term as tax protester cases that have been heard within the District of Oregon as a basis for determining that imposing a sentence of more than five years on Mr. Flowers would be excessive. He made reference to the fact that his research indicated that the longest such sentence in the district prior to Mr. Flowers' sentencing had been 30 months. And after evaluating the facts and circumstances of this particular case, decided that going above 30 months to 60 months was more than sufficient and beyond that would be an inappropriate disparity from the other cases. What about the government says, well, we weren't unnoticed that this really was a departure, so we weren't able to respond appropriately? Well, they were unnoticed that Mr. Flowers was seeking a concurrent sentence. There's no question about that. And the point, really, that I was making earlier about that. Well, I guess I'm just asking in response to their point, they were unnoticed about that, but they say they view that under the statutory authority to go concurrent versus consecutive as opposed to whether you evaluate it under a downward departure, so they didn't really respond in the same. It's like people were talking like this in their view. I mean, do you think that I guess what you're asking us to do is to say there's enough there to support what the district court did for it to not be an abuse? I am saying exactly that, that I believe that the court made findings that are sufficient to support what, in effect, was a downward departure and that the government was unnoticed that that sentence was being considered. If the government did not recognize that that, in effect, in this circuit constitutes a downward departure, that was their error. They did not ask the court to make more specific findings. They didn't object on that basis. And the court, I think, was well within its rights and exercising its discretion to impose concurrent sentences. Is the court interested in having me address any of the other issues? No, I think there's no other specific questions and the government didn't raise any. So if you've concluded on the consecutive concurrent issue, then we'll deem the case submitted. Thank you. Okay. So the United States versus Anderson is submitted. We will also submit on the briefs this morning. Flowers versus Hall and Earl X versus Morrow has been removed from the calendar. Thank you to all counsel and we'll adjourn for this morning. All rise. The court for this session stands adjourned.
judges: Hug, McKeown, Fisher